*274 Justice Thomas,
with whom The Chief Justice and Justice Scalia join,
dissenting.
In the early morning hours of November 16, 1985, petitioner Thomas Joe Miller-El and an accomplice, Kennard Flowers, robbed a Holiday Inn in Dallas, Texas. Miller-El and Flowers bound and gagged hotel employees Donald Hall and Doug Walker, and then laid them face down on the floor. When Flowers refused to shoot them, Miller-El shot each twice in the back, killing Walker and rendering Hall a paraplegic. Miller-El was convicted of capital murder by a jury composed of seven white females, two white males, a black male, a Filipino male, and a Hispanic male.
For nearly 20 years now, Miller-El has contended that prosecutors peremptorily struck potential jurors on the basis of race. In that time, seven state and six federal judges have reviewed the evidence and found no error. This Court concludes otherwise, because it relies on evidence never presented to the Texas state courts. That evidence does not, much less “clear[ly] and convincingly],” show that the State racially discriminated against potential jurors. 28 U. S. C. § 2254(e)(1). However, we ought not even to consider it: In deciding whether to grant Miller-El relief, we may look only to “the evidence presented in the State court proceeding.” § 2254(d)(2). The majority ignores that restriction on our review to grant Miller-El relief. I respectfully dissent.
I
Miller-El requests federal habeas relief from a state-court judgment, and hence our review is controlled by the Antiter-rorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. Because Miller-El’s claim of racial discrimination in jury selection was adjudicated on the merits in Texas state court, AEDPA directs that a writ of habeas corpus “shall not be granted” unless the state court’s decision “was based on an unreasonable determination of the facts in *275 light of the evidence presented in the State court proceeding” 28 U. S. C. § 2254(d)(2) (emphasis added).
To obtain habeas relief, then, Miller-El must show that, based on the evidence before the Texas state courts, the only reasonable conclusion was that prosecutors had racially discriminated against prospective jurors. He has not even come close to such a showing. The state courts held two hearings, but despite ample opportunity, Miller-El presented little evidence that discrimination occurred during jury selection. In view of the evidence actually presented to the Texas courts, their conclusion that the State did not discriminate was eminently reasonable. As a close look at the state-court proceedings reveals, the majority relies almost entirely on evidence that Miller-El has never presented to any Texas state court.
A
Jury selection in Miller-El’s trial took place over five weeks in February and March 1986. During the process, 19 of the 20 blacks on the 108-person venire panel were not seated on the jury: 3 were dismissed for cause, 6 were dismissed by the parties’ agreement, and 10 were peremptorily struck by prosecutors. Miller-El objected to 8 of these 10 strikes, asserting that the prosecutors were discriminating against black veniremen. Each time, the prosecutors proffered a race-neutral, case-related reason for exercising the challenge, and the trial court permitted the venireman to be removed. The remaining black venireman, Troy Woods, served on the jury that convicted Miller-El.
At the completion of voir dire, Miller-El moved to strike the jury under this Court’s decision in Swain v. Alabama, 380 U. S. 202 (1965), which required Miller-El to prove “systematic exclusion of black persons through the use of pe-remptories over a period of time.” Powers v. Ohio, 499 U. S. 400, 405 (1991). At the pretrial Swain hearing in March 1986, Miller-El presented three types of documentary evidence: the juror questionnaires of the 10 black veniremen *276 struck by the State; excerpts from a series of newspaper articles on racial bias in jury selection; and a manual on jury selection in criminal cases authored by a former Dallas County prosecutor. The voir dire transcript was part of the official record. Miller-El, however, introduced none of the other 98 juror questionnaires, no juror cards, and no evidence related to jury shuffling. See ante, at 256-257, n. 15.
Miller-El also presented nine witnesses, five of whom had spent time as prosecutors in the Dallas County District Attorney’s (D. A.) Office and five of whom were current or former judges in Dallas County. Their testimony made three things clear. First, the D. A.’s Office had never officially sanctioned or promoted racial discrimination in jury selection, as several witnesses testified, including the county’s Chief Public Defender as well as one of the first black prosecutors to serve in the D. A.’s Office. App. 842 (Baraka); id., at 846-848 (Tait); id., at 860 (Entz); id., at 864 (Kinkeade). Second, witnesses testified that, despite the absence of any official policy, individual prosecutors had almost certainly excluded blacks in particular cases. Id., at 880, 833 (Hampton); id., at 841-842 (Baraka); id., at 846-848 (Tait); id., at 863-864 (Kinkeade). Third and most important, no witness testified that the prosecutors in Miller-El’s trial — Norman Kinne, Paul Macaluso, and Jim Nelson — had ever engaged in racially discriminatory jury selection. Id., at 843 (Baraka); id., at 859 (Entz); id., at 863 (Kinkeade). The trial court concluded that, although racial discrimination “may have been done by individual prosecutors in individual cases,” there was no evidence of “any systematic exclusion of blacks as a matter of policy by the District Attorney’s office.” Id., at 882-883.
Miller-El was then tried, convicted, and sentenced to death. While his appeal was pending, this Court decided Batson v. Kentucky, 476 U. S. 79 (1986). Batson announced a new three-step process for evaluating claims that a prosecutor used peremptory challenges to strike prospective jurors because of their race:
*277 “First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question!; and t]hird, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination.” Miller-El v. Cockrell, 537 U. S. 322, 328-329 (2003) (Miller-El I).
The Texas Court of Criminal Appeals remanded Miller-El’s case for a hearing to be held under Batson.
B
At the Batson hearing in May 1988, before the same judge who had presided over his trial, Miller-El sought to establish that prosecutors at his trial had struck potential jurors on the basis of their race. To make his prima facie case, Miller-El reintroduced some of what he had presented two years earlier at the Swain hearing: the testimony of the nine witnesses, the 10 juror questionnaires, and the excerpted newspaper articles. App. 893-895. The court instructed the State to explain its strikes. Id., at 898-899. Of the 10 peremptory strikes at issue, prosecutors had already explained 8 at trial in response to Miller-El’s objections. The State therefore called Paul Macaluso, one of the prosecutors who had conducted the voir dire, to testify regarding his reasons for striking veniremen Paul Bailey and Joe Warren.
Macaluso testified that he had struck Bailey because Bailey seemed firmly opposed to the death penalty, even though Bailey tempered his stance during voir dire. Id., at 905-906. This was accurate. Bailey expressed forceful opposition to the death penalty when questioned by Macaluso. See, e. g., 11-(A) Record of Voir Dire 4110 (hereinafter Record) (“I don’t believe in capital punishment. Like I said on [my juror questionnaire], I don’t believe anyone has the right to take another person’s life”); id., at 4112 (saying that he *278 felt “[v]ery strongly” that the State should not impose the death penalty). Later, however, when questioned by defense counsel, Bailey said that he could impose the death penalty if the State proved the necessary aggravating circumstances. Id., at 4148-4150, 4152. When the trial court overruled the State’s challenge for cause, the State exercised a peremptory challenge. Id., at 4168.
Macaluso next testified that he dismissed venireman Warren because Warren gave inconsistent answers regarding his ability to apply the death penalty and because Warren’s brother had been recently convicted. App. 908-910. Maca-luso conceded that Warren was not as clearly unfavorable to the State as Bailey. Id., at 911. Nevertheless, Macaluso struck Warren because it was early in the jury selection process and the State had plenty of remaining peremptories with which it could remove marginal jurors. Macaluso candidly stated that he might not have removed Warren if fewer peremptories had been available. Id., at 910.
After the State presented nonracial, case-related reasons for all its strikes, the focus shifted to Batson’s third step: whether Miller-El had “carried his burden of proving purposeful discrimination.” Purkett v. Elem, 514 U. S. 765, 768 (1995) (per curiam); Batson, supra, at 97-98. At this point, Miller-El stood on his Swain evidence. App. 921. That evidence bore on whether some Balias County prosecutors had discriminated generally in past years; none of the evidence indicated that the prosecutors at Miller-El’s trial — Kinne, Macaluso, and Nelson — had discriminated in the selection of Miller-El’s jury. Moreover, none of this generalized evidence came close to demonstrating that the State’s explanations were pretextual in Miller-El’s particular trial.. Miller-El did not even attempt to rebut the State’s racially neutral reasons at the hearing. He presented no evidence and made no arguments. Id., at 919-922.
Nevertheless, the majority concludes that the trial judge was unreasonable in finding as a factual matter that the *279 State did not discriminate against black veniremen. Ante, at 266. That is not so “in light of the evidence presented in the State court proceeding.” 28 U. S. C. § 2254(d)(2). From the scanty evidence presented to the trial court, “it is at least reasonable to conclude” that purposeful discrimination did not occur, “which means that the state court’s determination to that effect must stand.” Early v. Packer, 537 U. S. 3, 11 (2002) (per curiam).
II
Not even the majority is willing, to argue that the evidence before the state court shows that the State discriminated against black veniremen. Instead, it bases its decision on juror questionnaires and juror cards that Miller-El’s new attorneys unearthed during his federal habeas proceedings and that he never presented to the state courts.[1] Ante, at 256-257, n. 15. Worse still, the majority marshals those documents in support of theories that Miller-El never argued to the state courts. AEDPA does not permit habeas petitioners to engage in this sort of sandbagging of state courts.
A
The majority discusses four types of evidence: (1) the alleged similarity between black veniremen who were struck by the prosecution and white veniremen who were not; (2) the apparent disparate questioning of black and white veniremen with respect to their views on the death penalty and their ability to impose the minimum punishment; (3) the use of the “jury shuffle” by the prosecution; and (4) evidence of historical discrimination by the D. A.’s Office in the selection of juries. Only the last was ever put before the Texas courts — and it does not prove that any constitutional viola *280 tion occurred at Miller-El’s trial. The majority’s discussion of the other types of evidence relies on documents like juror questionnaires and juror cards that were added to the record before the District Court.
The majority’s willingness to reach outside the state-court record and embrace evidence never presented to the Texas state courts is hard to fathom. AEDPA mandates that the reasonableness of a state court’s factual findings be assessed “in light of the evidence presented in the State court proceeding,” 28 U. S. C. § 2254(d)(2), and also circumscribes the ability of federal habeas litigants to present evidence that they “failed to develop” before the state courts. § 2254(e)(2); Williams v. Taylor, 529 U. S. 420, 429-430 (2000). Miller-El did not argue disparate treatment or disparate questioning at the Batson hearing, so he had no reason to submit the juror questionnaires or cards to the trial court. However, Miller-El could have developed and presented all of that evidence at the Batson hearing.[2] Consequently, he must satisfy § 2254(e)(2)’s requirements to adduce the evidence in federal court — something he cannot do. Williams, supra, at 437 (“Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings”). For instance, there is no doubt that Miller-El’s supplemental material could have been “previously discovered through the exercise of due diligence.” § 2254(e)(2)(A)(ii).
Just last Term, we summarily reversed the Court of Appeals for the Sixth Circuit for doing what the Court does *281 here: granting habeas relief on the basis of evidence not presented to the state court. See Holland v. Jackson, 542 U. S. 649, 652 (2004) (per curiam). We reaffirmed “that whether a state court’s decision was unreasonable must be assessed in light of the record the court had before it.” Ibid.; see also Miller-El I, 537 U. S., at 348 (“[Petitioner must demonstrate that a state court’s . . . factual determination was ‘objectively unreasonable’ in light of the record before the court”). In an about-face, the majority now reverses the Court of Appeals for the Fifth Circuit for failing to grant habeas relief on the basis of evidence not before the state court. By crediting evidence that Miller-El never placed before the state courts, the majority flouts AEDPA’s plain terms and encourages habeas applicants to attack state judgments collaterally with evidence never tested by the original triers of fact.
B
The majority presents three arguments for ignoring AEDPA’s requirement that the state-court decision be unreasonable “in light of the evidence presented in the State court proceeding.” 28 U. S. C. § 2254(d)(2). None is persuasive.
1
First, without briefing or argument on the question, the majority hints that we may ignore AEDPA’s limitation on the record under § 2254(d)(2) because the parties have ignored it. Ante, at 256-257, n. 15. The majority then quickly retreats and expressly does not decide the question. Ibid. But its retreat is as inexplicable as its advance: Unless § 2254(d)(2) is waivable and the parties have waived it, the majority cannot consider evidence outside the state-court proceedings, as it concededly does.
The majority’s venture beyond the state-court record is indefensible. Even if § 2254(d) is not jurisdictional, but see Lindh v. Murphy, 521 U. S. 320, 343-344 (1997) (Rehnquist, *282 C. J., dissenting), “it shares the most salient characteristic of jurisdictional statutes: Its commands are addressed to courts rather than to individuals,” id., at 344. Section 2254(d) speaks directly to federal courts when it states that a habeas application by a state prisoner “shall not be granted” except under the specified conditions. (Emphasis added); ibid. The strictures of § 2254(d) are not discretionary or waivable. Through AEDPA, Congress sought to ensure that federal courts would defer to the judgments of state courts, not the wishes of litigants.
Nevertheless, there is no need to decide whether § 2254(d)(2) may be waived, for the State has not waived it. Contrary to the majority’s assertions, ante, at 256-257, n. 15, the State has argued that § 2254(d)(2) bars our review of certain evidence not before the state trial court, Brief for Respondent 41-42, just as it did in its last appearance, see Brief for Respondent in Miller-El I, O. T. 2002, No. 01-7662, pp. 28-29, 39. The majority is correct that the State has not argued § 2254(d)(2) precludes consideration of the juror questionnaires and juror cards in particular, ante, at 256-257, n. 15, but the majority does not assert that the State may selectively invoke § 2254(d)(2) to cherry-pick only favorable evidence that lies outside the state-court record.
2
The majority next suggests that the supplemental material, particularly the juror questionnaires, might not expand on what the state trial court knew, since “the same judge presided over the voir dire, the Swain hearing, and the Bat-son hearing, and the jury questionnaires were subjects of reference at the voir dire.” Ante, at 257, n. 15. This is incorrect. At the Batson hearing, Miller-El introduced into evidence only the questionnaires of the 10 black veniremen peremptorily struck by the State. App. 893-895. The questionnaires of the other 98 veniremen — including many on which the majority relies — were never introduced into ev *283 idence or otherwise placed before the trial judge. Miller-El and the State had copies; the trial judge did not.
Yet the majority insinuates that the questionnaires effectively were before the state court because they “were subjects of reference at the voir dire.” Ante, at 257, n. 15. That is extremely misleading on the facts of this case. Although counsel for Miller-El and the State questioned witnesses partially on the basis of their questionnaire responses, the lawyers’ references to questionnaires were scattered and sporadic. Even the majority does not attempt to show that the specific questionnaire responses on which it relies were called to the trial court’s attention. Clearly they were not called to the trial court’s attention at the only time that mattered: the Batson hearing.
The majority’s insinuation is doubly misleading when coupled with its insistence that “the transcript of voir dire . .. was before the state courts.” Ante, at 242, n. 2. Miller-El’s arguments gave the state court no reason to go leafing through the voir dire transcript. What is more, voir dire at Miller-El’s trial lasted five weeks, and the transcript occupies 11 volumes numbering 4,662 pages. To think that two years after the fact a trial court should dredge up on its own initiative passing references to unseen questionnaires — references buried in a more than 4,600-page transcript no less — is unrealistic. That is why § 2254(d)(2) demands that state courts be taken to task only on the basis of evidence “presented in the State court proceeding.” The 98 questionnaires before the parties, unlike the 10 questionnaires that Miller-El entered into evidence, were not “presented” to the state court.
The majority also asserts that by considering the questionnaires, it is only attempting to help the State. After all, the State claims that any disparate questioning and treatment of black and white veniremen resulted from their questionnaires, not their respective races. As the majority sees it, if the questionnaires are not properly before us, then the State cannot substantiate its defense.
*284 This is a startling repudiation of both Batson and AEDPA. A strong presumption of validity attaches to a trial court’s factual finding at Batson’s third step, Hernandez v. New York, 500 U. S. 352, 364 (1991) (plurality opinion); id., at 372 (O’Connor, J., concurring in judgment); see also Batson, 476 U. S., at 98, n. 21, and that presumption is doubly strong when the Batson finding is under collateral attack in habeas, Miller-El I, 537 U. S., at 340. Thus, it is Miller-El’s burden to prove racial discrimination under Batson, and it is his burden to prove it by clear and convincing evidence under AEDPA. Without the questionnaires never submitted to the trial court, Miller-El comes nowhere near establishing that race motivated any disparate questioning or treatment, which is precisely why the majority must strain to include the questionnaires within the state-court record.
That Miller-El needs the juror questionnaires could not be clearer in light of how the Batson hearing unfolded. After offering racially neutral reasons for all of its strikes, the State could have remained silent — as Miller-El did. However, the State pointed out, among other things, that any disparate questioning of black and white veniremen was based on answers given on the juror questionnaires or during the voir dire process. App. 920-921. The State further noted that Miller-El had never alleged disparate treatment of black and white veniremen. Id., at 921. Because Miller-El did not dispute the State’s assertions, there was no need for the State to enter the juror questionnaires into the record. There was nothing to argue about. Miller-El had presented only generalized evidence of historical discrimination by the D. A.’s Office, which no one believes was sufficient in itself to prove a Batson violation. That is why Miller-El, not the State, marshaled supplemental material during his federal habeas proceedings. Without that evidence, he cannot prove now what he never attempted to prove 17 years ago: that the State’s justifications for its strikes were a pretext for discrimination.
*285 3
Finally, the majority suggests that the 2-year delay between the voir dire and the post-trial Batson hearing is reason for weakened deference. See ante, at 241, n. 1. This is an argument not for setting aside § 2254(d)(2)’s limit on the record, but for relaxing the level of deference due state courts’ factual findings under §§ 2254(d)(2) and (e)(1). The presumption of correctness afforded factual findings on ha-beas review, however, does not depend on the manner in which the trial court reaches its factual findings, for reasons I have explained before. Miller-El I, supra, at 357-359 (dissenting opinion). The majority leaves those arguments unanswered.
The majority’s own argument is implausible on its face: “ ‘[T]he usual risks of imprecision and distortion from the passage of time’ ” are far greater after 17 years than after 2. Ante, at 241, n. 1 (quoting Miller-El I, supra, at 343). The majority has it just backward. The passage of time, as AEDPA requires and as this Court has held, counsels in favor of more deference, not less. At least the trial court, unlike this Court, had the benefit of gauging the witnesses’ and prosecutors’ credibility at both the Swain and Batson hearings. Miller-El 1, supra, at 339 (“Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations”); see also Hernandez, supra, at 364 (plurality opinion); Batson, supra, at 98, n. 21.
Ill
Even taken on its own terms, Miller-El’s cumulative evidence does not come remotely close to clearly and convincingly establishing that the state court’s factual finding was unreasonable. I discuss in turn Miller-El’s four types of evidence: (1) the alleged disparate treatment and (2) disparate questioning of black and white veniremen; (3) the prosecu *286 tion’s jury shuffles; and (4) historical discrimination by the D. A.’s Office in the selection of juries. Although each type of evidence “is open to judgment calls,” ante, at 265, the majority finds that a succession of unpersuasive arguments amounts to a compelling case. In the end, the majority’s opinion is its own best refutation: It strains to demonstrate what should instead be patently obvious.
A
The majority devotes the bulk of its opinion to a side-by-side comparison of white panelists who were allowed to serve and two black panelists who were struck, Billy Jean Fields and Joe Warren. Ante, at 240-252. The majority argues that the prosecution’s reasons for striking Fields and Warren apply equally to whites who were permitted to serve, and thus those reasons must have been pretextual. The voir dire transcript reveals that the majority is mistaken.
It is worth noting at the outset, however, that Miller-El’s and the Court’s claims have always been a moving target. Of the 20 black veniremen at Miller-El’s trial, 9 were struck for cause or by the parties’ agreement, and 1 served on the jury. Miller-El claimed at the Batson hearing that all 10 remaining black veniremen were dismissed on account of race. That number dropped to 7 on appeal, and then again to 6 during his federal habeas proceedings. Of those 6 black veniremen, this Court once found debatable that the entire lot was struck based on race. Miller-El I, supra, at 343. However, 4 (Carrol Boggess, Roderick Bozeman, Wayman Kennedy, and Edwin Rand) were dismissed for reasons other than race, as the majority effectively concedes. Ante, at 252-253, n. 11; Miller-El I, supra, at 351-354 (SCALIA, J., concurring).
The majority now focuses exclusively on Fields and Warren. But Warren was obviously equivocal about the death penalty. In the end, the majority’s case reduces to a single venireman, Fields, and its reading of a 20-year-old voir dire *287 transcript that is ambiguous at best. This is the antithesis of clear and convincing evidence.
1
From the outset of questioning, Warren did not specify when he would vote to impose the death penalty. When asked by prosecutor Paul Macaluso about his ability to impose the death penalty, Warren stated, “[T]here are some cases where I would agree, you know, and there are others that I don’t.” 3 Record 1526. Macaluso then explained at length the types of crimes that qualified as capital murder under Texas law, and asked whether Warren would be able to impose the death penalty for those types of heinous crimes. Id., at 1527-1530. Warren continued to hedge: “I would say it depends on the case and the circumstances involved at the time.” Id., at 1530. He offered no sense of the circumstances that would lead him to conclude that the death penalty was an appropriate punishment.
Macaluso then changed tack and asked whether Warren believed that the death penalty accomplished any social purpose. Id., at 1531-1532. Once again, Warren proved impossible to pin down: “Yes and no. Sometimes I think it does and sometimes I think it don’t. Sometimes you have mixed feelings about things like that.” Id., at 1532. Macaluso then focused on what the death penalty accomplished in those cases where Warren believed it useful. Ibid. Even then, Warren expressed no firm view:
“I don’t know. It’s really hard to say because I know sometimes you feel that it might help to deter crime and then you feel that the person is not really suffering. You’re taking the suffering away from him. So it’s like I said, sometimes you have mixed feelings about whether or not this is punishment or, you know, you’re relieving personal punishment.” Ibid.
While Warren’s ambivalence was driven by his uncertainty that the death penalty was severe enough, ante, at 250-251, *288 that is beside the point. Throughout the examination, Warren gave no indication whether or when he would prefer the death penalty to other forms of punishment, specifically life imprisonment. 3 Record 1532-1533. To prosecutors seeking the death penalty, the reason for Warren’s ambivalence was irrelevant.
At voir dire, there was no dispute that the prosecution struck Warren not for his race, but for his ambivalence on the death penalty. Miller-El’s attorneys did not object to the State’s strikes of Warren or Paul Bailey, though they objected to the removal of every other black venireman. Both Bailey and Warren shared the same characteristic: It was not clear, based on their questionnaires and voir dire testimony, that they could impose the death penalty. See supra, at 277-278. In fact, Bailey was so clearly struck for nonracial reasons that Miller-El has never objected to his removal at any stage in this case. ■
There also was no question at the Batson hearing why the prosecution struck Warren. Macaluso testified:
“I thought ¡Warren’s statements on voir dire] were inconsistent responses. At one point he says, you know, on a case-by-case basis and at another point he said, well, I think — I got the impression, at least, that he suggested that the death penalty was an easy way out, that they should be made to suffer more.’’ App. 909.
In addition, Macaluso noted that Warren’s brother recently had been convicted for a crime involving food stamps. Id., at 909-910. This suggested that Warren might be more sympathetic to defendants than other jurors. Macaluso was quite candid that Warren was not as obviously disfavorable to the State as Bailey, and Macaluso stated that he might not have exercised a peremptory against Warren later in jury selection. Id., at 910-911. But Macaluso used only his 6th of 15 peremptory challenges against Warren.
*289 According to the majority, Macaluso testified that he struck Warren for his statement that the death penalty was “ ‘an easy way out,’ ” ante, at 248 (quoting App. 909), and not for his ambivalence about the death penalty, ante, at 250-251. This grossly mischaracterizes the record. Macaluso specifically testified at the Batson hearing that he was troubled by the “inconsisten[cy]” of Warren’s responses. App. 909 (emphasis added). Macaluso was speaking of Warren’s ambivalence about the death penalty, a reason wholly unrelated to race. This was Macaluso’s “stated reason,” and Macaluso ought to “stand or fall on the plausibility” of this reason — not one concocted by the majority. Ante, at 252.
The majority points to four other panel members — Kevin Duke, Troy Woods, Sandra Jenkins, and Leta Girard — who supposedly expressed views much like Warren’s, but who were not struck by the State. Ante, at 248. According to the majority, this is evidence of pretext. But the majority’s premise is faulty. None of these veniremen was as difficult to pin down on the death penalty as Warren. For instance, Duke supported the death penalty. App. 373 (“I’ve always believed in having the death penalty. I think it serves a purpose”); ibid. (“I mean, it’s a sad thing to see, to have to kill someone, but they shouldn’t have done the things that they did. Sometimes they deserve to be killed”); id., at 394 (“If I feel that I can answer all three of these [special-issue] questions yes and I feel that he’s done a crime worthy of the death penalty, yes, I will give the death penalty”). By contrast, Warren never expressed a firm view one way or the other.
Troy Woods, who was black and who served on the jury, was even more supportive of the death penalty than Duke. The majority suggests that prosecutors might have allowed Woods to serve on the jury because they were running low on peremptories or they wanted to obscure a pattern of discrimination. Ante, at 249-250. That such rank conjecture *290 can serve as “clear and convincing evidence” is error in its own right, but it is also belied by the record. Woods said that capital punishment was “too quick” because defendants “don’t feel the pain.” App. 409. When asked what sort of punishment defendants ought to receive, Woods said that he would “[p]our some honey on them and stake them out over an ant bed.” Ibid. He testified that he would mete out such sentences because if defendants “survive for a length of time, that would be enough punishment and . . . they wouldn’t do it again.” Id., at 410 (alteration omitted). Woods also testified that he was a lifelong believer in the death penalty, id., at 410-411; that he could impose death generally as a juror, id., at 413; and that he could impose death for murder during the course of a robbery, the specific crime of which Miller-El stood accused, ibid. It is beyond cavil why the State accepted Woods as a juror: He could impose the punishment sought by the State.
Nevertheless, even assuming that any of these veniremen expressed views similar to Warren’s, Duke, Woods, and Gi-rard were questioned much later in the jury selection process, when the State had fewer peremptories to spare. Only Sandra Jenkins was questioned early in the voir dire process, and thus only Jenkins was even arguably similarly situated to Warren. However, Jenkins and Warren were different in importánt respects. Jenkins expressed no doubt whatsoever about the death penalty. She testified that she had researched the death penalty in high school, and she said in response to questioning by both parties that she strongly believed in the death penalty’s value as a deterrent to crime. 3 Record 1074-1075, 1103-1104. This alone explains why the State accepted Jenkins as a juror, while Miller-El struck her. In addition, Jenkins did riot have a relative who had been convicted of a crime, but Warren did. At the Batson hearing, Macaluso testified that he struck Warren both for Warren’s inconsistent responses regarding the death penalty and for his brother’s conviction. Supra, at 278.
*291 The majority thinks it can prove pretext by pointing to white veniremen who match only one of the State’s proffered reasons for striking Warren. Ante, at 248. This defies logic. “ ‘Similarly situated’ does not mean matching any one of several reasons the prosecution gave for striking a potential juror — it means matching all of them.” Miller-El I, 537 U. S., at 362-363 (Thomas, J., dissenting); cf. Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U. S. 669, 683 (1983) (Title VII of the Civil Rights Act of 1964 discrimination occurs when an employee is treated ““‘in a manner which but for that person’s sex would be different” ’ ” (quoting Los Angeles Dept. of Water and Power v. Manhart, 435 U. S. 702, 711 (1978))). Given limited peremptories, prosecutors often must focus on the potential jurors most likely to disfavor their case. By ignoring the totality of reasons that a prosecutor strikes any particular venireman, it is the majority that treats potential jurors as “products of a set of cookie cutters,” ante, at 247, n. 6 — as if potential jurors who share only some among many traits must be treated the same to avoid a Batson violation. Of course jurors must not be “identical in all respects” to gauge pretext, ante, at 247, n. 6, but to isolate race as a variable, the jurors must be comparable in all respects that the prosecutor proffers as important. This does not mean “that a defendant cannot win a Batson claim unless there is an exactly identical white juror.” Ibid. It means that a defendant cannot support a Batson claim by comparing veniremen of different races unless the veniremen are truly similar.
2
The second black venireman on whom the majority relies is Billy Jean Fields. Fields expressed support for the death penalty, App. 174-175, but Fields also expressed views that called into question his ability to impose the death penalty. Fields was a deeply religious man, id., at 173-174, 192-194, and prosecutors feared that his religious convictions might make him reluctant to impose the death penalty. Those *292 fears were confirmed by Fields’ view that all people could be rehabilitated if introduced to God, a fear that had special force considering the special-issue questions necessary to impose the death penalty in Texas. One of those questions asked whether there was a probability that the defendant would engage in future violence that threatened society. When they reached this question, Macaluso and Fields had the following exchange:
“[MACALUSO:] What does that word probability mean to you in that connotation?
“[FIELDS:] Well, it means is there a possibility that [a defendant] will continue to lead this type of life, will he be rehabilitated or does he intend to make this a lifelong ambition.
“[MACALUSO:] Let me ask you, Mr. Fields, do you feel as though some people simply cannot be rehabilitated? “[FIELDS:] No.
“[MACALUSO:] You think everyone can be rehabilitated?
“[FIELDS:] Yes.” Id., at 183-184.
Thus, Fields indicated that the possibility of rehabilitation was ever-present and relevant to whether a defendant might commit future acts of violence. In light of that view, it is understandable that prosecutors doubted whether he could vote to impose the death penalty.
Fields did testify that he could impose the death penalty, even on a defendant who could be rehabilitated. Id., at 185. For the majority, this shows that the State’s reason was pre-textual. Ante, at 244. But of course Fields said that he could fairly consider the death penalty — if he had answered otherwise, he would have been challengeable for cause. The point is that Fields’ earlier answers cast significant doubt on whether he could impose the death penalty. The very purpose of peremptory strikes is to allow parties to *293 remove potential jurors whom they suspect, but cannot prove, may exhibit a particular bias. See Swain, 380 U. S., at 220; J. E. B. v. Alabama ex rel. T. B., 511 U. S. 127, 148 (1994) (O’Connor, J., concurring). Based on Fields’ voir dire testimony, it was perfectly reasonable for prosecutors to suspect that Fields might be swayed by a penitent defendant’s testimony.[3] The prosecutors may have been worried for nothing about Fields’ religious sentiments, but that does not mean they were instead worried about Fields’ race.
As with Warren, the majority attempts to point to similarly situated nonblack veniremen who were not struck by the State, but its efforts again miss their mark for several reasons. First, the majority would do better to begin with white veniremen who were struck by the State. For instance, it skips over Penny Crowson, a white panelist who expressed a firm belief in the death penalty, but who also stated that she probably would not impose the death penalty if she believed there was a chance the defendant could be rehabilitated. Ante, at 245, n. 5; 3 Record 1211. The State struck Crowson, which demonstrates that it “was concerned *294 about views on rehabilitation when the venireperson was not black.” Ante, at 245, n. 4.
Second, the nonblack veniremen to whom the majority points — Sandra Hearn, Mary Witt, and Fernando Gutierrez — were more favorable to the State than Fields for various reasons.[4] For instance, Sandra Hearn was adamant about the value of the death penalty for callous crimes. App. 430, 451-452. Miller-El, of course, shot in cold blood two men who were lying before him bound and gagged. In addition, Hearn’s father was a special agent for the Federal Bureau of Investigation, and her job put her in daily contact with police officers for whom she expressed the utmost admiration. Id., at 445-446, 457-460. This is likely why the State accepted Hearn and Miller-El challenged her for cause. Id., at 447, 467.
In fact, on appeal Miller-El’s counsel had this to say about Hearn: “If ever — if ever — there was a Venireperson that, should have been excluded for cause from the Jury in this case, or any capital Murder Jury, it was Venirewoman HEARN. It is hoped that the Lord will save us from future jurors with her type of thinking and beliefs.” Id., at 1015 (emphasis added and alteration omitted); see also id., at 1010. This same juror whom Miller-El’s counsel once found so repugnant has been transformed by the majority’s revisionist history into a defense-prone juror just as objectionable to the State as Fields. Ante, at 244.
*295 Mary Witt did not even have the same views on rehabilitation as Fields: She testified to the commonplace view that some, but not all, people can be rehabilitated. 6 Record 2461. Moreover, Witt expressed strong support for the death penalty. Id., at 2414-2416, 2443-2444. She testified that the death penalty was appropriate for the crime of murder in the course of a robbery, id., at 2428, or for a convict who was released from prison and committed murder (Miller-El previously had twice spent time in prison for armed robberies), id., at 2462-2463. This is likely why the State accepted Witt and Miller-El struck her. Id., at 2464-2465. Finally, Fernando Gutierrez testified that he could impose the death penalty for brutal crimes. 11-(B) Record 4391-4392. In fact, the only issue during voir dire was whether Gutierrez could apply Texas’ more lenient penalties, not its more severe ones. Id., at 4398-4399, 4413-4414, 4431. The court questioned Gutierrez at length, and ultimately he was accepted by both parties and seated on the jury. Id., at 4439-4449.
Third, Hearn, Witt, and Gutierrez were not similarly situated to Fields even apart from their views on the death penalty. Fields was dismissed not only for his prodefense views on rehabilitation, but also because his brother had several drug convictions and had served time in prison. App. 190, 199. Hearn, Witt, and Gutierrez did not have relatives with significant criminal histories. Thus, there was an additional race-neutral reason to dismiss Fields that simply was not true of the other jurors. Surely the State did not need to expend peremptories on all veniremen who expressed some faith in rehabilitation to avoid violating Batson.
The majority dismisses as “makeweight” the State’s justification as to Fields’ brother, ante, at 246, but it is the majority’s arguments that are contrived. The State questioned Fields during voir dire about his brother’s drug offenses, where the offenses occurred, whether his brother had been tried, whether his brother had been convicted, and whether *296 his brother’s criminal history would affect Fields’ ability to serve on the jury. App. 190. The State did not fail to engage in a “ ‘meaningful voir dire examination/ ” as the majority contends. Ante, at 246 (quoting Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000)).
The majority also contends that the State’s justification as to Fields’ brother illustrates pretext, because the State first pointed to Fields’ views on rehabilitation as the reason for its strike. Ante, at 245-246. The timing of the State’s explanation was unexceptional. In context, the State discussed Fields’ brother at essentially the same time it discussed Fields’ religious views. The entire exchange between the State and counsel for Miller-El took place in a couple of minutes at most. App. 197-199. Thus, to call the State’s second reason an “afterthought,” ante, at 246, ignores what is obvious even from a cold record: that the State simply offered both of its reasons in quick succession.
B
Miller-El’s claims of disparate questioning also do not fit the facts. Miller-El argues, and the majority accepts, that the prosecution asked different questions at voir dire of black and nonblack veniremen on two subjects: (1) the manner of execution and (2) the minimum punishment allowed by state law. The last time this case was here, I refuted Miller-El’s claim that the prosecutors’ disparate questioning evinced racial bias, and explained why it did not even entitle him to a certificate of appealability. Miller-El I, 537 U. S., at 363-370 (dissenting opinion).
This time, the majority has shifted gears, claiming that a different set of jurors demonstrates the State’s racial bias. The majority’s new claim is just as flawed as its last. The State questioned panelists differently when their questionnaire responses indicated ambivalence about the death penalty. Any racial disparity in questioning resulted from the *297 reality that more nonblack veniremen favored the death penalty and were willing to impose it.
1
While most veniremen were given a generic description of the death penalty at the outset of their voir dire examinations, some were questioned with a “graphic script” that detailed Texas’ method of execution. Ante, at 255. According to Miller-El and the majority, prosecutors used the graphic script to create cause for removing black veniremen who were ambivalent about or opposed to the death penalty. Ante, at 260. This is incorrect.
The jury questionnaires asked two questions directly relevant to the death penalty. Question 56 asked, “Do you believe in the death penalty?” It offered panelists the chance to circle “yes” or “no,” and then asked them to “[pjlease explain your answer” in the provided space. E. g., Joint Lodging 6. Question 58 asked, “Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would ultimately result in the execution of another human being?” and offered panelists only the chance to circle “yes” or “no.” Ibid.
According to the State, those veniremen who took a consistent stand on the death penalty — either for or against it— did not receive the graphic script. These prospective jurors either answered “no” to question 56 and “yes” to question 58 (meaning they did not believe in the death penalty and had qualms about imposing it), or answered “yes” to question 56 and “no” to question 58 (meaning they did believe in the death penalty and had no qualms about imposing it). Only those potential jurors who answered inconsistently, thereby indicating ambivalence about the death penalty, received the graphic script.
The questionnaires bear out this distinction. Fifteen blacks were questioned during voir dire. Only eight of them — or 53% — received the graphic script. All eight had *298 given ambivalent questionnaire answers regarding their ability to impose the death penalty. There is no question that veniremen Baker, Bailey, Boggess, Woods, and Butler were ambivalent in their questionnaire answers. See ante, at 260, n. 27; 4 Record 1874-1875.[5] The majority claims that Keaton, Kennedy, and Mackey were not ambivalent, ante, at 258-259, and nn. 17, 19, but their questionnaire answers show otherwise. For instance, Keaton circled “no” for question 56, indicating she did not believe in the death penalty, and wrote, “It’s not for me to punished [sic] anyone.” Joint Lodging 55. However, she then circled “no” for question 58, indicating that she had no qualms about imposing the death penalty. Ibid. Likewise, Mackey indicated she did not believe in the death penalty and wrote “Thou Shall Not Kill” in the explanation space. Id., at 79. Mackey then said that she had no qualms, religious or otherwise, about imposing the death penalty, even though she had just quoted one of the Ten Commandments. Ibid. Keaton’s and Mackey’s answers cannot be reconciled, and the majority makes no attempt to do so. Ante, at 258, n. 17. Kennedy wrote on his questionnaire that he would impose the death penalty “[o]nly in extreme cases, such as multiple murders.” Joint Lodging 46. This left prosecutors uncertain about whether Kennedy could impose the death penalty on Miller-El, who had murdered only one person (though he had paralyzed another).
Of the seven blacks who did not receive the graphic script, six took a stand on the death penalty — either for or against it — in their questionnaires. There was no need to use the graphic script to clarify their positions. Veniremen Boze- *299 man, Fields, Rand, and Warren all answered “yes” to question 56 (indicating that they believed in the death penalty) and “no” to question 58 (indicating that they had no qualms about imposing it).[6] Id., at 6 (Bozeman); id., at 14 (Fields); id., at 80 (Rand); id., at 22 (Warren). Venireman Mosley was the opposite: He said that he was opposed to the death penalty, 7 Record 2656, 2681, and that he definitely could not impose it, id., at 2669-2670. The same appears true of venireman Smith, 2 id., at 927-928, who was so adamantly opposed to the death penalty throughout her voir dire that she was struck for cause, id., at 1006. The only apparent exception is venireman Carter. She said that she believed in the death penalty, but wrote on the questionnaire, “Yes and no. It would depend on what the person had done.” 4 id., at 1993 (internal quotation marks omitted). She then answered “ ‘[y]es’ ” to question 58, indicating that she had some difficulties with imposing the death penalty. Ibid. Despite her ambivalence, Carter did not receive the full graphic script. Prosecutors told her only that Miller-El “[would] be executed by lethal injection at Huntsville.” Id., at 1952.
Thus far, the State’s explanation for its use of the graphic script fares far better than Miller-El’s or the majority’s. Questionnaire answers explain prosecutors’ use of the graphic script with 14 out of the 15 blacks, or 93%. By contrast, race explains use of the script with only 8 out of 15 veniremen, or 53%. The majority’s more nuanced explanation is likewise inferior to the State’s. It hypothesizes that the script was used to remove only those black veniremen ambivalent about or opposed to the death penalty. Ante, at 260. But that explanation accounts for only 12 out of 15 veniremen, or 80%. The majority cannot explain why prosecutors did not use the script on Mosley and Smith, who were opposed to the death penalty, or Carter, who was ambivalent. *300 Because the majority does not account for veniremen like Carter, and also mischaracterizes veniremen like Keaton, Kennedy, and Mackey, it arrives at different percentages. This is not clear and convincing evidence of racial bias.
The State’s explanation also accounts for its treatment of the 12 nonblack veniremen (10 whites, 1 Hispanic, and 1 Filipino) on whom the majority relies. Granted, it is more difficult to draw conclusions about these nonblack veniremen. With the blacks, 11 of their 15 questionnaires are available; with the nonblacks, that number plummets to 3 of 12, because those veniremen were not discussed before the state court. See supra, at 279. Nevertheless, the questionnaires and voir dire permit some tentative conclusions.
First, of the five nonblacks who received the graphic script — Desinise, Evans, Gutierrez, Sztybel, and Zablan— four were ambivalent. On his questionnaire, Gutierrez answered both that he believed in the death penalty and that he had qualms about imposing it. Joint Lodging 231. Szty-bel and Zablan averred that they believed in the death penalty and could impose it, but their written answers to question 56 made it unclear under what circumstances they could vote to impose the death penalty.[7] Desinise is a closer call, but he was genuinely undecided about his ability to impose the death penalty, and the parties struck him by agreement. 3 Record 1505-1506,1509,1511,1514. Of the five nonblacks who received the graphic script, Evans was the only one steadfastly opposed to the death penalty. 6 id., at 2588-2589, 2591, 2595.
Of the seven nonblacks who allegedly did not receive the graphic script, four were strongly opposed to the death penalty. See Miller-El I, 537 U. S., at 364-365 (Thomas, J., dis *301 senting). Berk, Hinson, and Nelson were so opposed that they were struck for cause, and Holtz was struck by the State because he was opposed unless a policeman or fireman was murdered. Ibid. Administering the graphic script to these potential jurors would have been useless. “No trial lawyer would willingly antagonize a potential juror ardently opposed to the death penalty with an extreme portrait of its implementation.” Id., at 364.
Of the remaining three nonblacks, the majority is correct that Moses was ambivalent in her questionnaire responses, 3 Record 1140-1141, 1177, although it is not certain that Vickery was, 4 id., at 1611. Neither received the graphic script. However, the final nonblack, Girard, confirms the State’s explanation. It was not clear from Girard’s questionnaire whether she was ambivalent.[8] On the stand, prosecutor Nelson started off with the abstract script. 6 id., at 2520-2521. But it quickly became apparent that Girard was “just not real sure” about her ability to impose the death penalty, and she testified that she had not decided its value as a form of punishment. Id., at 2522-2523. At that point, Nelson gave her the graphic script — for no other reason than to discern her basic reaction. Id., at 2524-2525. Not only did it succeed — Girard testified that she did not want to serve on a capital jury, id., at 2529, 2531 — but Miller-El’s attorney also used the graphic script when he questioned Girard, id., at 2553. Miller-El’s counsel was using the graphic script just as the State was: to discern a potential juror’s true feelings, not to create cause for removing a venireman. After all, Girard’s views were favorable to Miller-El.
In any event, again the State’s explanation fares well. The State’s explanation accounts for prosecutors’ choice between the abstract and graphic scripts for 9 of 12 nonblack *302 veniremen, or 75%. Moses and Vickery were likely ambivalent but did not receive the graphic script, while Evans was opposed to the death penalty but did receive it. However, the majority’s theory accounts for the State’s treatment of only 6 of 12 nonblacks, or 50%. The majority can explain why jurors like Moses and Vickery did not receive the graphic script, because it believes the State was using the graphic script primarily with blacks opposed to or ambivalent about the death penalty. Ante, at 260. But the majority cannot explain the State’s use of the script with an opposed nonblack like Evans, or ambivalent nonblacks like Desinise, Girard, Gutierrez, Sztybel, and Zablan.
Finally, the majority cannot take refuge in any supposed disparity between use of the graphic script with ambivalent black and nonblack veniremen. Ante, at 257-259. The State gave the graphic script to 8 of 9 ambivalent blacks, or 88%, and 5 of 7 ambivalent nonblacks, or 71%. This is hardly much of a difference. However, when the majority lumps in veniremen opposed to the death penalty, ibid., the disparity increases. The State gave the graphic script to 8 of 11 ambivalent or opposed blacks, or 73%, and 6 of 12 ambivalent or opposed nonblacks, or 50%. But the reason for the increased disparity is not race: It is, as the State maintains, that veniremen who were opposed to the death penalty did not receive the graphic script.
In sum, the State can explain its treatment of 23 of 27 potential jurors, or 85%, while the majority can only account for the State’s treatment of 18 of 27 potential jurors, or 67%. This is a far cry from clear and convincing evidence of racial bias.
2
Miller-El also alleges that the State employed two different scripts on the basis of race when asking questions about imposition of the minimum sentence. This disparate-questioning argument is even more flawed than the last one. The evidence confirms that, as the State argues, prosecutors *303 used different questioning on minimum sentences to create cause to strike veniremen who were ambivalent about or opposed to the death penalty. Brief for Respondent 33, and n. 26.
Of the 15 blacks, 7 were given the minimum punishment script (MPS). All had expressed ambivalence about the death penalty, either in their questionnaires (Baker, Boggess, and Kennedy) or during voir dire (Bozeman, Fields, Rand, and Warren).[9] Woods expressed ambivalence in his questionnaire, but his voir dire testimony made clear that he was a superb juror for the State. See supra, at 289-290. Thus, Woods did not receive the MPS. There was no reason to give the MPS to Butler, Carter, Mosley, or Smith, all of whom were dismissed for cause or by agreement of the parties. That leaves Bailey, Keaton, and Mackey, all of whom were so adamantly opposed to the death penalty during voir dire that the State attempted to remove them for cause. 11-(A) Record 4112, 4120, 4142 (Bailey); id., at 4316 (Keaton); 10 id., at 3950, 3953 (Mackey). Because the State believed that it already had grounds to strike these potential jurors, it did not need the MPS to disqualify them. However, even assuming that the State should have used the MPS on these 3 veniremen, the State’s explanation still accounts for 7 of the 10 ambivalent blacks, or 70%.
The majority does not seriously contest any of this. Ante, at 261-262, and n. 34. Instead, it contends that the State used the MPS less often with nonblacks, which demonstrates that the MPS was a ruse to remove blacks. This is not true: The State used the MPS more often with ambivalent non-blacks who were not otherwise removable for cause or by agreement.
*304 Of the nonblacks who reached the point in the voir dire sequence where the MPS was typically administered, the majority points to 11 whom it alleges were ambivalent and should have received the script. Ante, at 262, and n. 34. Three of these veniremen — Gibson, Gutierrez, and Holtz— were given the MPS, just like many of the blacks. Four of the remaining eight veniremen — Moses, Salsini, Vickery, and Witt — were favorable enough to the State that Miller-El peremptorily struck them.[10] The State had no interest in disqualifying these jurors. Two of the remaining four veniremen — Hearn and Mazza — indicated that they could impose the death penalty, both on their questionnaires and during voir dire. The State likewise had no interest in disqualifying these jurors. Assuming that the State should have used the MPS on the two remaining veniremen, Crowson and Whaley, the State’s explanation still accounts for 9 of the 11 ambivalent nonblacks, or 81%. Miller-El’s evidence is not even minimally persuasive, much less clear and convincing.
C
Miller-El’s argument that prosecutors shuffled the jury to remove blacks is pure speculation. At the Batson hearing, Miller-El did not raise, nor was there any discussion of, the topic of jury shuffling as a racial tactic. The record shows only that the State shuffled the jury during the first three weeks of jury selection, while Miller-El shuffled the jury during each of the five weeks. This evidence no more proves that prosecutors sought to eliminate blacks from the jury, than it proves that Miller-El sought to eliminate whites even more often. Miller-El I, 537 U. S., at 360 (Thomas, J., dissenting).
*305 Miller-El notes that the State twice shuffled the jury (in the second and third weeks) when a number of blacks were seated at the front of the panel. Ante, at 254. According to the majority, this gives rise to an “inference” that prosecutors were discriminating. Ante, at 255. But Miller-El should not be asking this Court to draw “inference[s]”; he should be asking it to examine clear and convincing proof. And the inference is not even a strong one. We do not know if the nonblacks near the front shared characteristics with the blacks near the front, providing race-neutral reasons for the shuffles. We also do not know the racial composition of the panel during the first week when the State shuffled, or during the fourth and fifth weeks when it did not.
More importantly, any number of characteristics other than race could have been apparent to prosecutors from a visual inspection of the jury panel. See Ladd v. State, 3 S. W. 3d 547, 563-564 (Tex. Crim. App. 1999). Granted, we do not know whether prosecutors relied on racially neutral reasons, ante, at 254-255, but that is because Miller-El never asked at the Batson hearing. It is Miller-El’s burden to prove racial discrimination, and the jury-shuffle evidence itself does not provide such proof.
D
The majority’s speculation would not be complete, however, without its discussion (block-quoted from Miller-El I) of the history of discrimination in the D. A.’s Office. This is nothing more than guilt by association that is unsupported by the record. Some of the witnesses at the Swain hearing did testify that individual prosecutors had discriminated. Ante, at 264. However, no one testified that the prosecutors in Miller-El’s trial — Norman Kinne, Paul Macaluso, and Jim Nelson — had ever been among those to engage in racially discriminatory jury selection. Supra, at 276.
The majority then tars prosecutors with a manual entitled Jury Selection in a Criminal Case (hereinafter Manual or *306 Sparling Manual), authored by John Sparling, a former Dallas County prosecutor. There is no evidence, however, that Kinne, Macaluso, or Nelson had ever read the Manual— which was written in 1968, almost two decades before Miller-El’s trial.[11] The reason there is no evidence on the question is that Miller-El never asked. During the entire Batson hearing, there is no mention of the Sparling Manual. Miller-El never questioned Macaluso about it, and he never questioned Kinne or Nelson at all. The majority simply assumes that all Dallas County prosecutors were racist and remained that way through the mid-1980’s.
Nor does the majority rely on the Manual for anything more than show. The Manual contains a single, admittedly stereotypical line on race: “Minority races almost always empathize with the Defendant.” App. 102. Yet the Manual also tells prosecutors not to select “anyone who had a close friend or relative that was prosecuted by the State.” Id., at 112. That was true of both Warren and Fields, and yet the majority cavalierly dismisses as “makeweight” the State’s justification that Warren and Fields were struck because they were related to individuals convicted of crimes. Ante, at 246,250, n. 8. If the Manual is to be attributed to Kinne, Macaluso, and Nelson, then it ought to be attributed in its entirety. But if the majority did that, then it could not point to any black venireman who was even arguably dismissed on account of race.
Finally, the majority notes that prosecutors “ ‘marked the race of each prospective juror on their juror cards.’ ” Ante, at 264 (quoting Miller-El I, supra, at 347). This suffers from the same problems as Miller-El’s other evidence. Prosecutors did mark the juror cards with the jurors’ race, sex, and juror number. We have no idea — and even the majority cannot bring itself to speculate — whether this was *307 done merely for identification purposes or for some more nefarious reason. The reason we have no idea is that the juror cards were never introduced before the state courts, and thus prosecutors were never questioned about their use of them.
* * *
Thomas Joe Miller-El’s charges of racism have swayed the Court, and AEDPA’s restrictions will not stand in its way. But Miller-El has not established, much less established by clear and convincing evidence, that prosecutors racially discriminated in the selection of his jury — and he certainly has not done so on the basis of the evidence presented to the Texas courts. On the basis of facts and law, rather than sentiments, Miller-El does not merit the writ. I respectfully dissent.

 The supplemental material appears in a joint lodging submitted by the parties. It includes the State’s copies of questionnaires for 12 prospective jurors (11 of whom served at Miller-El’s trial) and the State’s juror cards for all 108 members of the venire panel.

 The juror questionnaires had been in Miller-El’s possession since before the 1986 Swain hearing; Miller-El’s attorneys used them during the voir dire. But because Miller-El did not argue disparate treatment or questioning at the Batson hearing, Miller-El’s attorneys had no reason to submit the questionnaires to the trial court. The juror cards could have been requested at any point under the Texas Public Information Act. See Supplemental , Briefing on Batson/Swain Claim Based on Previously Unavailable Evidence, Record in No. 00-10784 (CA5), p. 2494.

 The majority argues that prosecutors mischaracterized Fields’ testimony when they struck him. Ante, at 244. This is partially true but wholly irrelevant. When Miller-El’s counsel suggested that Fields’ strike was related to race, prosecutor Jim Nelson responded:
“[W]e’re certainly not exercising a preemptory [sic] strike on Mr. Fields because of his race in this case, but we do have concern with reference to some of his statements as to the death penalty in that he said that he could only give death if he thought a person could not be rehabilitated and he later made the comment that any person could be rehabilitated if they find God or are introduced to God and the fact that we have a concern that his religious feelings may affect his jury service in this case.” App. 197 (alteration omitted).
Nelson partially misstated Fields’ testimony. Fields had not said that he would give the death penalty only if a person was beyond rehabilitation, id., at 185, but he had said that any person could be rehabilitated if introduced to God, id., at 184. This is precisely why prosecutors were concerned that Fields’ “religious feelings [might] affect his jury service.” Id., at 197.

 In explaining why veniremen Hearn, Witt, and Gutierrez were more favorable to the State than Fields, the majority faults me for “focus[ing] on reasons the prosecution itself did not offer.” Ante, at 245, n. 4. The majority’s complaint is hard to understand. The State accepted Hearn, Witt, and Gutierrez. Although it is apparent from the voir dire transcript why the State wanted to seat these veniremen on the jury, it was never required to “offer” its reasons for doing so. If the majority instead means that I focus on whether these veniremen opposed the death penalty and whether they had relatives with significant criminal histories, those are precisely the reasons offered by the State for its strike of Fields.

 The majority’s own recitation of the voir dire transcript captures Butler’s ambivalence. Ante, at 258-259, n. 19. Butler said both that she had no qualms about imposing the death penalty, 4 Record 1906-1907, and that she would impose the death penalty “only when a crime has been committed concerning a child such as beating to death or some form of harsh physical abuse and when an innocent victim’s life is taken,” id., at 1874.

 The State’s concerns with Fields and Warren stemmed not from their questionnaire responses, but from their subsequent voir dire testimony. Supra, at 288, 293.

 Joint Lodging 184 (Sztybel) (“If a person is found guilty of murder or other crime, which they have taken someone else’s life, without a valid defense. They may continue to do this again and again. Even if they are sentenced to jail when they are released this could keep happening”); id., at 223 (Zablan) (“If it’s the law and if the crime fits such punishment”).

 Girard did not answer question 56 about her belief in the death penalty, 6 Record 2522, but she indicated in answer to question 58 that her personal beliefs would not prevent her from imposing the death penalty, id., at 2555-2556.

 In making the decision whether to employ the MPS, prosecutors could rely on both the questionnaires and substantial voir dire testimony, because the minimum punishment questioning occurred much later in the voir dire than questioning about the death penalty. Miller-El I, 537 U. S. 322, 369 (2003) (Thomas, J., dissenting).

 Moses gave ambivalent answers on her questionnaire, as perhaps did Vickery. Supra, at 302. However, Moses and Vickery indicated during their voir dire testimony that they could impose the death penalty, 3 Record 1139-1141; 4 id., at 1576-1579, and thus they were not questioned on minimum sentences. But see ante, at 263, n. 36.

 Judge Larry Baraka, one of the first black prosecutors to serve in the D. A.’s Office, testified that, to the best of his recollection, the Manual was no longer used in 1977 when he attended the training course. App. 844.